# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Michael Lee Beitman, | No. CV 17-03829-PHX-JAT (DMF) |
| Plaintiff, | |
| v. | **ORDER** |
| Correct Care Solutions, et al., | |
| Defendants. | |

Plaintiff Michael Lee Beitman,[1] who is confined in the Arizona State Prison Complex-Florence, South Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against Correct Care Solutions (CCS), CCS employee Dr. Martin Gruenberg, Arizona Department of Corrections (ADC) Director Charles Ryan, and Corizon Health Inc. (Doc. 7.)[2] Before the Court is the Motion for Summary Judgment filed by CCS and Dr. Gruenberg, which Ryan and Corizon joined. (Docs. 103, 140.)[3] The Court will deny the Motion for Summary Judgment.

---

[1] The case caption reads "Michael Lee Beitman" as that is how Beitman listed his name in the original complaint. (Doc. 1). Apparently, Beitman's name is "Lee Michael Beitman." (Doc. 7-1 at 10.) Beitman must file a motion requesting to amend the case caption if he would like the caption to list his correct name.

[2] CCS is the private medical provider contracted to provide medical services at the Central Arizona Correctional Facility, a private prison in Florence, Arizona that is operated by the GEO Group. (Doc. 104 ¶ 2; Doc. 128 ¶ 5.) Corizon is the private medical provider formerly contracted to provide medical services at ADC facilities.

[3] Upon the filing of Defendants' Motion, the Court issued an order with the notice required under *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1989) (en banc), which

# I.    BACKGROUND

Beitman alleges that on February 3, 2015, he was assaulted by other prisoners and suffered a concussion and fractures to his face and ribs. (Doc. 7-1 at 2 ¶¶ 1–2.) Beitman claims that Dr. Gruenberg refused to send him to the hospital for treatment, and, although x-rays were ultimately taken, Beitman was told there were no fractures despite Beitman's claims that his bones "would undue and grind." (*Id.* at 2–3 ¶¶ 5, 8, 10, 19.) Beitman states that a year later, on February 1, 2016, he was assaulted at a different facility, and his right cheekbone and jaw were fractured. (*Id.* at 5 ¶ 24.) Beitman claims that he again did not receive specialist treatment or proper follow-up care. (*Id.* ¶¶ 27–29.) Beitman was then transferred to the Eyman Complex, where he filed a grievance regarding his claims about the lack of treatment, but he was denied any further medical treatment. (*Id.* at 5–6 ¶¶ 30, 32, 34.) Beitman sued for declaratory relief, damages, and injunctive relief in the form of medical treatment to repair damage to his face. (Doc. 7 at 7.)

Upon screening, the Court determined that Beitman sufficiently stated Eighth Amendment claims against Dr. Gruenberg, CCS, Ryan, and Corizon for failure to treat Beitman's injuries, failure to provide follow-up care, and failure to act to remedy the lack of treatment. (Doc. 8.)[4]

Dr. Gruenberg and CCS filed a Motion for Summary Judgment arguing that Beitman cannot show he suffered any fractures in the February 3, 2015 altercation and, because there were no fractures, neither Dr. Gruenberg nor CCS can be liable for failing to treat non-existent conditions. (Doc. 103 at 4.) They further argue that Dr. Gruenberg saw Beitman and sent him for x-rays, and thereafter relied on the x-ray results; thus, there

informed Beitman of the summary judgment requirements under Federal Rule of Civil Procedure 56. (Doc. 109.)

[4] The Court recognizes a claim against Ryan in his individual capacity as a supervisor as well as a claim against Ryan in his official capacity as Director of the ADC because Beitman is seeking injunctive relief in the form of "medical treatment to re-fracture and repair the damage to [Beitman]'s face." (Doc. 7 at 6–7); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that state officials can be sued in their official capacity for injunctive relief); Ariz. Rev. Stat. Ann. § 31-201.01(D) (providing the ADC Director bears ultimate responsibility for the provision of medical care for Arizona prisoners).

was no failure to respond to a medical need sufficient to constitute deliberate indifference. (*Id.* at 4–5.) Ryan and Corizon joined the Motion for Summary Judgment. (Doc. 131; Doc. 140.)[5]

## II.     SUMMARY JUDGMENT STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. v. Fritz Co.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

---

[5] Ryan and Corizon failed to file a summary judgment motion, and the Court denied their request to file a summary judgment motion three months after the deadline. (Docs. 131, 140.) But the Court granted Ryan and Corizon leave to join CCS and Gruenberg's Motion for Summary Judgment. (Doc. 140.)

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The court does not make credibility determinations on summary judgment, and it must draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). Further, where the nonmovant is pro se, the court must consider as evidence in opposition to summary judgment all of the pro se litigant's contentions that are based on personal knowledge and that are set forth in verified pleadings and motions. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *see Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

## III.   RELEVANT FACTS

### A.   Central Arizona Correctional Facility

In February 2015, Beitman, who is in the custody of the ADC, was housed at the Central Arizona Correctional Facility in Florence, Arizona. (Doc. 128 ¶ 3.) On the morning of February 3, 2015, Beitman states that three other prisoners hit him in the head and kicked him in the ribs. (Doc. 129 ¶ 3.) Beitman alleges he suffered injuries to his face and chest as a result. (*Id.*) Shortly after the assault, Beitman claims a correctional officer found Beitman in the shower and brought him to the prison medical facility. (*Id.* ¶ 4.)

Beitman asserts he was seen by Nurse Practitioner Ramirez. (Doc. 129 ¶ 9.) Beitman claims that he was bleeding out of his nose and down his throat, that it felt like the side of his face was crushed, and that he could feel his cheekbone moving and crunching when he touched the side of his face. (*Id.*) He also states he was dizzy, nauseous, and confused. (*Id.*) Beitman states he reported to NP Ramirez that he had difficulty breathing due to the injuries to his ribs on the left side, and he could feel one or two of his ribs "pop and click with a sharp pain" every time he took a breath. (*Id.* ¶ 10.)

Beitman asserts that he was in severe pain and that he told NP Ramirez that he had a broken cheekbone and broken ribs and that he wanted to go to the hospital for x-rays, a

- 4 -

CT scan, and specialist treatment. (*Id.*) According to Beitman, NP Ramirez pushed a finger into Beitman's cheekbone, which made it move and crunch and caused Beitman to yell out in pain. (*Id.* ¶ 11.) Beitman claims that NP Ramirez said that the bone might be broken. (*Id.*) Beitman states that Ramirez then pushed fingers against Beitman's ribs and felt a pop and click when he took a breath. (*Id.*) Beitman asserts NP Ramirez said a rib might be broken or dislocated but that there is no treatment. (*Id.*) Beitman claims that NP Ramirez then said x-rays would be taken in two days after the swelling decreased. (*Id.*) In the medical record, NP Ramirez noted that Beitman had left eye orbital ecchymosis (skin discoloration from bleeding underneath) and lower rib tenderness. (Doc. 104-1 at 6.) NP Ramirez provided Beitman Ibuprofen for pain and then placed Beitman in the Central Detention Unit. (*Id.*; Doc. 129 ¶ 12.)

The medical record includes an entry by a nurse that is dated February 4, 2015, and states "l[eft] eye orbital series tomorrow to xray." (Doc. 104-1 at 6.) Dr. Gruenberg approved the referral to radiology for the x-rays that same day. (*Id.* at 2 ¶ 9; *see also id.* at 6.) Beitman avers that on February 5, 2015, he was taken to medical to get x-rays from a portable x-ray machine. (Doc. 129 ¶ 19.) Beitman asked that an x-ray also be taken of his ribs, but he claims he was told there was no order for a rib x-ray. (*Id.*)

Defendants submit a medical record, dated February 5, 2015, but with no time documented, which appears to show that Beitman was examined that day, with vitals listed, objective notes, and an assessment of "orbit contusion" and "rib pain." (Doc. 104-1 at 7.) This medical record includes a notation that "orbit series wnl [within normal limits]," and it documents a plan for "left rib series with CXR PA/LAT [chest x-rays posterior-anterior view/lateral view]." (*Id.*) Next to this entry for chest x-rays, it states "ord[er] for 2/12." (*Id.*) This medical record is stamped and initialed by Nurses Sanchez and Sylvia and by Dr. Gruenberg. (*Id.*) But Beitman claims he was not examined on February 5, 2015; Beitman states he was not assessed or evaluated by another provider until seven days after the February 3, 2015 assault. (Doc. 129 ¶¶ 22, 24.) However, Defendants submitted medical records showing that Beitman did have contact, of some

- 5 -

form, with a member of the health staff each day from February 3 to February 11. (Docs. 104-1 at 6–14.)[6]

On February 9, 2015, Beitman submitted a Health Needs Request (HNR), in which he wrote that he needed to go to the hospital to be examined, x-rayed, and treated by an orthopedic physician; that he needed to continually push his cheekbone back into place; that his broken rib was tearing up his back; that the facility doctor lied about Beitman's condition; and that the x-ray tech refused to x-ray his ribs. (Doc. 128-2 at 14.) The response to this HNR indicated that Beitman was referred to the nurse line. (*Id.*)

On the morning of February 10, 2015, in response to the HNR, Beitman saw Nurse Mason. (Doc. 104-1 at 10.) Beitman complained that his cheekbone crunched when he ate and that he would push it back into place; that his ribs were cracking and poking him; and that he had dizziness. (*Id.*) Nurse Mason took Beitman's vitals, told him that that the orbital x-rays were within normal limits, and noted that rib x-rays were already scheduled. (*Id.*) Nurse Mason documented that Beitman had rib tenderness but no shortness of breath was noted. (*Id.*) Nurse Mason instructed Beitman on "splinting" his ribs when he coughed and not to push his face bone. (*Id.* at 11; Doc. 129 ¶ 25.)

On February 10, 2015, Dr. Gruenberg generated a medical record documenting his review of the nurse's notes. (Doc. 104-1 at 13; *see* Doc. 128-1 ¶ 31.)[7] Dr. Gruenberg

---

[6] There is also one partially-illegible health record that Defendants submitted that appears to document that Beitman saw health staff on February 17, 2015, and another illegible date, but it is impossible to decipher what occurred on either date from the medical record. (Doc. 104-1 at 15.)

[7] Beitman argues that the Court should not consider the February 10, 2015 medical record generated by Dr. Gruenberg (Doc. 104-1 at 13) on the grounds that it contains irrelevant and immaterial statements. (Doc. 128 ¶¶ 26–28; Doc. 128-1 ¶ 28–32.) But, a court considers only relevant evidence on summary judgment, and thus, an objection as to the relevance of evidence on summary judgment is "duplicative of the summary judgment standard itself." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). Beitman also raises a hearsay objection to a statement in the medical record specifically relating to a radiologist's interpretation of his x-rays. (*See* Doc. 127 at 10.) Defendants claim the radiologist's statement is admissible as a statement made for medical treatment or as a business record. (Doc. 130 at 3 (citing Fed. R. Evid. 803(4), (6)).) Defendants did not establish that these rules apply. (*See id.*) Consequently, the Court will ignore the purported statements by the radiologist in the medical record for purposes of deciding Defendants' Motion for Summary Judgment. *See Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988) (holding that party's

referred to Beitman's February 9, 2015 HNR, noting that Beitman "wrote an HNR calling me a liar! The Deputy Warden is aware and proper disciplinary actions will be implemented."[8] (Doc. 104-1 at 13.) In the medical note, Dr. Gruenberg assessed "left orbit injury" and "rib pain," and he noted "rib series with cxr [chest x-ray] pending." (*Id.*)

On February 11, 2015, Beitman saw Dr. Gruenberg. (*Id.* at 14; Doc. 129 ¶ 33.) Warden Bennie Rollins and Officer Lewis observed this encounter. (Doc. 104-1 at 13–14.) Beitman claims that he reported to Dr. Gruenberg that he had a broken cheekbone and that he moved the cheekbone back and forth to show Dr. Gruenberg. (Doc. 129 ¶ 33.) Beitmen asserts that Dr. Gruenberg then used his thumb and pushed Beitman's cheekbone into his cheek, causing Beitman to yell in pain. (*Id.*) Beitman alleges that Dr. Gruenberg commented that the bone might be broken. (*Id.*) Beitman claims that Dr. Gruenberg then used his fingers on Beitman's lower ribs and felt them pop and click when Beitman took a breath. (*Id.*) Beitman states that Dr. Gruenberg commented that the rib might be broken or dislocated, and he informed Beitman that x-rays had been ordered. (*Id.*) Beitman claims that Dr. Gruenberg refused Beitman's requests for an orthopedic physician, a CT scan, or an MRI. (*Id.*)

In the medical record for this encounter, Dr. Gruenberg noted Beitman's reports of dizziness and sinus pressure; that the left orbital contusion was healing; that the teeth were intact; that there was tenderness to the left maxilla; and that there was tenderness to the left rib at the T8 level. (Doc. 104-1 at 14.) He also made the following notations:

　· "xrays are all wnl [within normal limits]. Read by a Radiologist";

　· "orbit contusion: neg xrays as per Board Cert Radiologist";

---

failure "to lay a foundation for any exception to the hearsay rule" required that court ignore hearsay evidence on summary judgment). The Court makes clear, however, that this ruling does not extend to trial. Should Defendants offer the February 10, 2015 medical record at trial, Beitman will have to object for the Court to consider excluding it.

　[8] Beitman raises a hearsay objection to this statement. (Doc. 129 at 9–10). However, Beitman's statements are admissible under Federal Rule of Evidence 801(d)(2)(A). Dr. Gruenberg can testify as to what Beitman said without relying on the medical record that the statement appears in. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (holding substance of evidence must be admissible but not necessarily the *form* of the evidence). Therefore, the objection is overruled.

· "rib pain; contusion/sprain: xrays are neg as per Board Cert Radiologist";

· "repeat left rib series and left orbit series next week to r/o [rule out] delayed frac[ture]";

· "naprosyn 500 mg po bid x 2 weeks for pain";

· "meclizine 25 mg po q6 h prn dizziness x 2 weeks."

(*Id.*)[9] Defendants did not submit any x-rays or copies of radiological reports, nor are the board-certified radiologists identified by Defendants. (*See* Doc. 104-1.) There is also no evidence that the x-rays were repeated as noted on the February 11, 2015 medical record. (*See* Docs. 104; 104-1.)

Beitman claims he was taken to medical on February 12, 2015, and had x-rays taken of his face and ribs from the portable x-ray machine. (Doc. 129 ¶ 40.) According to Beitman, this was the first and only time that x-rays were taken of his ribs. (*Id.* ¶ 36.) Beitman submits one page from a two-page "Diagnostics Imaging Report," which is dated February 12, 2015, and which shows partial results of left rib x-rays. (Doc. 128-2 at 22.) The report states that "[t]he bony ossification of the left ribs is normal," that "[t]here is no fracture or costovertebral dislocation," and that "[n]o pneumothorax is seen." (*Id.*) The report concludes, "normal left rib series." (*Id.*) This page of the "Diagnostics Imaging Report" is stamped and initialed by Dr. Gruenberg on February 12, 2015. (*Id.*)

Beitman claims he remained in the Central Detention Unit for another five weeks, during which time he did not see Dr. Gruenberg again, nor did he have any further rib or orbital x-rays performed. (Doc. 129 ¶ 41.) Beitman asserts that he showed a nurse or officer clots of blood that he spat out every day, which came from his sinuses where the injured bone damaged his sinus wall. (*Id.*) During these five weeks, Beitmen reports that his cheekbone eventually stopped moving; it stayed pushed in about 1/3 to 1/2 inch compared to the right cheekbone. (*Id.*) Beitman states that, even though the bone stopped

---

[9] As noted, above, *supra* pp. 6–7 note 7, the Court does not consider any of the purported interpretations of x-rays by the radiologist for their truth as those statements would then constitute hearsay and Defendants have not established that any exception to the hearsay rule applies here.

moving, the bleeding from his sinuses did not stop. (*Id.*) Beitman asserts that he submitted multiple HNRs reporting his symptoms, but medical staff ignored his requests. (Doc. 7-1 at 4 ¶ 21.)

On March 18, 2015, Beitman submitted an HNR stating that he had thick clots of blood still coming from his sinuses from where the cheekbone "is still puncturing the area." (Doc. 128-2 at 16.) He also wrote that the area continued to cause him dizziness. (*Id.*) The HNR response indicated that Beitman was referred to the nurse line. (*Id.*)

On March 19, 2015, Beitman was taken to medical and seen by Nurse Ranquillo in response to his HNR. (Doc. 129 ¶ 42; Doc. 104-1 at 16.) Beitman claims that he reported to Nurse Ranquillo that he was still bleeding, that he showed her a clot in a tissue, and that he stated that he felt medical had let his alleged fracture improperly heal out of place. (Doc. 129 ¶ 42.) In the medical record for this encounter, Nurse Ranquillo documented Beitman's complaints of continued problems with his sinus cavity since the alleged blunt force trauma to the left orbital area, and she noted some pain, but that there were no signs of swelling or tenderness to the left orbital. (Doc. 104-1 at 16–17.)

On March 20, 2015, Beitman was taken to medical and seen by Nurse Sanchez. (Doc. 129 ¶ 43; Doc. 104-1 at 18.) Beitman showed her another blood clot, and she took his vitals. (Doc. 129 ¶ 43.) In the medical record, Nurse Sanchez noted that an assessment was "deferred," and she documented that Beitman was "cleared for transport" to another yard. (Doc. 104-1 at 18.)

## B.    ASPC-Eyman, Cook Unit

Beitman was transferred to the ASPC-Eyman, Cook Unit, where Corizon was responsible for providing prisoner health services. (Doc. 7 at 2; Doc. 7-1 at 4 ¶¶ 22–23.)

Beitman claims that he continued to suffer complications with his orbital bone, including headaches, severe pain, and exophthalmos (bulging of the eye). (Doc. 129 ¶ 44.) On April 20, 2015, Beitman filed a medical grievance complaining that he had not received proper examination, diagnosis, and treatment for a fractured cheekbone suffered in the assault on February 3, 2015, and he wrote that it was obvious to a layperson that

his cheekbone was crushed inward and had healed improperly. (Doc. 7-1 at 14.) Beitman appealed this grievance up to Director Ryan by filing a grievance appeal in May 2015. (*Id.* at 12.) On July 10, 2015, Ryan denied the grievance appeal and wrote that an investigation and review of the medical records showed that Beitman was seen numerous times; a left orbital x-ray performed on February 5, 2015, was within normal limits; and a rib x-ray performed on February 12, 2015, was "essentially normal." (*Id.*)

### C. ASPC-Kingman

After nine months in the Cook Unit, Beitman was moved to ASPC-Kingman, a private prison facility in Kingman, Arizona that is operated by GEO Group. (Doc. 7-1 at 4 ¶ 23.) Beitman asserts that he was assaulted on February 1, 2016, by other prisoners and suffered injuries to his right orbital/cheekbone and right jaw. (*Id.* at 5 ¶ 24.) Beitman claims x-rays were done at ASPC-Kingman on February 4, 2016, and that the x-ray technician told Beitman that he could see the previous fractures on Beitman's left side. (*Id.* ¶ 25.) Beitman states he was taken to Southwest Imaging in Kingman for a CT scan of his skull the next day. (*Id.* ¶ 26.)[10] According to Beitman, a provider submitted a referral to an ear, nose, and throat (ENT) specialist, and Beitman was informed that he would be taken to an ENT; however, this visit apparently never occurred. (*Id.* ¶ 27; *id.* at 18, 21.) Instead, Beitman claims he was placed into solitary confinement in the detention unit for approximately seven weeks and then transferred. (*Id.* ¶ 29.)

### D. ASPC-Eyman, Cook Unit

On March 22, 2016, Beitman was transferred back to the ASPC-Eyman, Cook Unit, where Corizon was still responsible for providing prisoner health services. (Doc. 7-1 ¶ 29) On March 24, 2016, Beitman submitted an HNR seeking follow-up treatment for his fractures; however, he was not seen and did not receive treatment. (*Id.* at 21.)

On April 7, 2016, Beitman filed a grievance stating that he had not received treatment for his fractures suffered on February 1, 2016, nor had he seen an ENT

---

[10] The parties did not submit any medical records, x-rays, CT scans, or radiological reports from 2016.

specialist, and he requested to be seen by a maxillofacial specialist. (*Id.*) Beitman appealed this grievance up to Director Ryan by filing a grievance appeal in June 2016. (*Id.* at 18.) On January 5, 2017, Ryan denied the appeal and wrote that an investigation showed that facial x-rays performed on February 4, 2016, showed no evidence of acute fractures and a CT scan performed on February 5, 2016, showed non-displaced fractures of the lateral wall of the right orbit as well as the walls of the right maxillary sinus. (*Id.*) Ryan wrote that a referral was made to an ENT specialist; however, Beitman was transferred before action was taken, and since his arrival to the Cook Unit, he had had medical encounters, and that it was determined that an outside consult is not medically necessary. (*Id.*)

### E.    ASPC-Florence, South Unit

At some time in 2017, Beitman was transferred to the ASPC-Florence, South Unit. (*See* Doc. 7-1 at 18; Doc. 1-1 at 1.)

Beitman claims he saw Nurse Maurice Owiti on March 22, 2019, and that Owiti examined Beitman's maxillary orbital area and eyes and told Beitman that the prison health care provider would not treat fractured orbitals due to the cost. (Doc. 129 ¶ 44.) Owiti submitted a consult request for Beitman to see an optometrist, and the reason for the request was "left eye pressure from deformed socket causing headaches and blurry vision." (Doc. 128-2 at 18.)

On April 20, 2019, Beitman saw Dr. Daniel Bray, the on-site optometrist. (Doc. 128-2 at 19.) The medical record for this encounter documents that Bray "referred [Beitman] to ophthal[mologist] for eval. of lag ophthalmos [inability to completely close eyelids completely] due to orbital fracture." (*Id.*) On May 21, 2019, Nurse Practitioner Hahn submitted a consult request for Beitman to see an ophthalmologist pursuant to Dr. Bray's referral. (*Id.* at 20.)

Beitman claims that, in July 2019, Beitman saw an ophthalmologist in Phoenix, and the ophthalmologist confirmed that Beitman suffered exophthalmos, headaches, and incomplete eye closure due to an orbital fracture. (Doc. 129 ¶ 46.)

## IV.  DR. GRUENBERG

### A.  Legal Standard

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard.

First, a prisoner must show a "serious medical need." *Id.* (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992) (internal citation omitted), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt*, 865 F.2d at 200 (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

**B.  Discussion**

**1.  Serious Medical Need**

Defendants suggest that there was no serious medical need because, according to the medical records, neither Beitman's face nor his ribs were fractured; therefore, Dr. Gruenberg cannot be liable for failing to treat "non-existent conditions." (Doc. 103 at 4.) Defendants assert that Dr. Gruenberg "relied on the[] radiological reports in determining that [Beitman] had no facial or rib fractures caused by the February 3, 2015 altercation." (*Id.* at 2). But, Defendants did not proffer any of the x-rays or radiological reports, and, as noted above, *supra* pp. 6–7 note 7, Defendants rely on hearsay statements attributed to an unnamed radiologist within the medical records. (*See* Doc. 104; Doc. 104-1 at 2–3.) Defendants submit no other evidence to support their assertion that Beitman did not suffer fractures or have some other serious medical need. (*See* Doc. 104 at 1–2.)

Although Defendants assert that "[Beitman]'s entire claim against CCS and [Dr.] Gruenberg rests on his assertion that his face and ribs were fractured during the altercation on February 3, 2015," (Doc. 103 at 4–5), that is not correct. Beitman could establish a serious medical need without suffering fractures. *See McGuckin*, 974 F.2d at 1059–60.

Beitman has established that there is a triable issue of fact as to whether his injuries from the February 3, 2015 assault was a serious medical need. Beitman asserts that after the February 3, 2015 assault, he was found partially conscious and taken to medical for treatment. (Doc. 129 ¶ 4.) Beitman claims that he was bleeding from his nose and down his throat, that he could feel his cheekbone moving and crunching when he touched the side of his face, that he was dizzy and nauseous, that he had difficulty breathing, that he had a sharp rib pain every time he took a breath, that he was in severe

pain, and that he was informed that x-rays could not be taken until the swelling went down. (*Id.* at 3–4 ¶¶ 9–11.) The medical records also document that Beitman had an orbital hematoma, eye orbital ecchymosis, and rib tenderness. (Doc. 104-1 at 6.) Beitman claims that he continued to suffer severe pain, he had ongoing rib tenderness, his cheekbone continued to crunch and move when touched, he continued to bleed out of his nose, and he had problems with sinus pressure and his sinus cavity. (*See, e.g.*, *id.* at 14, 16; Doc. 129 ¶¶ 11, 19, 25, 41; Doc 128 ¶¶ 41–42.) And, Beitman claims that he had weeks of severe pain. (Doc. 129 ¶ 41.) In fact, medical staff gave Beitman pain medication. (Doc. 104-1 at 14.) The evidence therefore supports a finding that Beitman not only suffered through chronic and substantial pain but also that his injuries could be seen as worthy of comment or treatment by a reasonable doctor or patient. *See McGuckin*, 974 F.2d at 1059–60, 1062 ("There is no doubt that [the inmate]'s pain and medical condition demonstrated his 'serious medical need.'"). Consequently, there is a genuine dispute of material fact as to whether Beitman had a serious medical need, especially given that, at this stage, the Court reviews the evidence in the light most favorable to Beitman. *See Anderson*, 477 U.S. at 249.

Beitman also offers evidence in support of his claims that he suffered fractures, which may also constitute a serious medical need. *See Madrid v. Gomez*, 889 F. Supp. 1146, 1200–01 (N.D. Cal. 1995). First, Beitman asserts that NP Ramirez and Dr. Gruenberg examined Beitman and that each told Beitman that he might have suffered fractures. (Doc. 128 ¶ 11; Doc. 128-1 ¶ 33.) In fact, the medical record, dated February 11, 2015, instructed that Beitman's ribs and face be x-rayed again to rule out a delayed fracture. (Doc. 104-1 at 14.) No evidence offered by Defendants confirms that these x-rays occured. (*See* Doc. 104; Doc. 104-1). Also, Beitman avers that in 2016, an x-ray technician informed him that skull x-rays showed a previous left orbital fracture. (Doc. 7-1 at 5 ¶ 25.) And, Beitmen offers documentation from Dr. Bray, which states that Beitman should be referred for evaluation of "lag ophthalmos due to orbital fracture." (Doc. 128-2 at 19). Finally, Beitman states that he was in severe pain for a significant

period of time after the February 3, 2015 altercation and that he has facial disfigurement potentially consistent with facial fractures. (Doc. 129 ¶ 41; Doc. 7 at 4.) Viewing the record in the light most favorable to Beitman, as the Court must, there is a triable issue as to whether Beitman suffered fractures.[11]

In short, there is a genuine dispute of material fact as to whether Beitman sustained fractures or whether he at least suffered through weeks of severe pain. Either scenario is sufficient for a jury to find a serious medical need. *See McGuckin*, 974 F.2d at 1059–60. Accordingly, there is a triable issue of fact as to whether Beitman had a serious medical need following the February 3, 2015 assault.

### 2.    Deliberate Indifference

The analysis therefore turns to the deliberate-indifference prong, and the initial question is whether Dr. Gruenberg knew of Beitman's serious medical need. *See Jett*, 439 F.3d at 1097. The medical record documented Beitman's injuries following the February 3, 2015 assault, and in his declaration, Dr. Gruenberg avers that Beitman suffered injuries that caused him to order orbital and rib x-rays. (Doc. 104-1 at 2 ¶¶ 8–9, 11.) Beitman submitted an HNR asking to go to the hospital to see a specialist and explaining that he had to continually push his cheekbone back into place and that his broken rib was "tearing up [his] back." (Doc. 7-1 at 13.) Dr. Gruenberg's own documentation in the medical record indicates he was aware of the HNR. (Doc. 104-1 at 13.) And Beitman

_____

[11] Beitman's materials include an email, dated February 12, 2015, that appears to be related to his x-rays, that states Beitman had a "[n]ormal left rib series" based on results that showed "[t]he bony ossification of the left ribs is normal" and that "[t]here is no fracture or costovertebral dislocation." (Doc. 128-2 at 22.) However, Defendants did not offer this evidence or rely on it in the Motion for Summary Judgment. (Doc. 103; Doc. 104; Doc. 104-1.) It is *Defendants'* burden—as the movants—to establish that there are no genuine disputes of material fact by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute[] or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Moreover, Defendants broadly asserted that they were entitled to summary judgment because "CCS and Dr. Gruenberg relied on the radiological findings in determining [Beitman] had not suffered fractures." (Doc. 130 at 2.) However, as noted, evidence in the record supports Beitman's claims of a facial fracture, which establishes a genuine dispute of material fact as to whether Beitman suffered fractures. The Court will not parse out distinct issues—such as whether there was a facial fracture but not a rib fracture—where Defendants chose not to do so.

claims that, during the approximately five weeks Beitman was held in detention after the assault, he filed multiple HNRs reporting his symptoms and seeking medical attention. (Doc. 7-1 at 4 ¶ 21.) The inference can be made that Dr. Gruenberg was aware of these HNRs. *See Jett*, 439 F.3d at 1094, 1097 (concluding that the plaintiff, the party opposing summary judgment, was entitled to an inference that the defendant prison doctor was aware of the medical slips the plaintiff continued to submit asking to be sent to a specialist for treatment for a fractured thumb). In fact, medical records, signed by Dr. Gruenberg, indicated that Beitman was prescribed pain medication. (*See, e.g.*, Doc. 104-1 at 14.) On this record, a reasonable jury could find that Dr. Gruenberg was aware of Beitman's serious medical need following the February 3, 2015 assault.

Next, the Court considers Dr. Gruenberg's response to Beitman's alleged medical need. Defendants argue that Dr. Gruenberg sent Beitman for x-rays and relied on the radiological findings in determining that Beitman did not suffer any fractures; thus, Dr. Gruenberg cannot be liable for deliberate indifference for providing no further treatment to Beitman for his complaints based on these findings. (Doc. 103 at 4–5; Doc. 130 at 2–3.) Defendants claim that, even if the Court assumes that Beitman "is able to present evidence that he actually suffered from the fracture of which he complains, his claim that [Dr.] Gruenberg (and through him CCS) was deliberately indifferent to his medical needs fails as a matter of law." (Doc. 103 at 4–5.) From there, Defendants assert that "[t]here was no 'purposeful act' or failure to respond to [Beitman]'s requests for medical care" as "[Dr.] Gruenberg sent [Beitman] for diagnostic x-rays[] and relied on the results of those x-rays, which showed no fractures." (*Id.* at 5.)

But, again, Defendants did not offer evidence of the x-rays and the Court cannot consider the hearsay evidence within the medical records relating to the radiologist's interpretation of the x-rays that Defendants cite, *see supra* pp. 6–7 note 7. As such, Defendants have not established that it properly responded to Beitman's serious medical by merely relying on the x-rays that Defendants failed to offer.

Further, as noted, the record supports Beitman's claims that he had a serious medical need—whether or not Beitman suffered fractures. There is evidence that Beitman suffered severe pain in his left orbital bone, that he had frequent bleeding from his sinuses, that his cheekbones continued to crunch and move when touched, that he had sinus cavity problems, and that he had rib and back pain so severe that he asked to have his rib removed. (Doc. 7-1 at 4 ¶¶ 19, 21; Doc. 129 ¶¶ 30, 31, 33, 41–44; Doc. 104-1 at 14, 16.) Beitman indicated that he was suffering from pain and symptoms in multiple HNRs; however, Dr. Gruenberg reportedly did not respond to Beitman's request. (Doc. 7-1 at 4 ¶¶ 19, 21.) Indeed, Defendants concede that Dr. Gruenberg and CSS "provided no further treatment to [Beitman] for his complaints" after medical staff took x-rays of Beitman in February 2015. (*See* Doc. 130 at 2.) And, a jury could find that merely giving Beitman pain medication was not enough to treat Beitman's injuries should it find Beitman had a serious medical need, especially if the jury finds that further treatment was denied to save money as Beitman claims. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 245 (1983); *Garbarini v. Ulit*, No. 1:14-CV-01058-AWI, 2015 WL 2165396, at *8 (E.D. Cal. May 7, 2015); *Villanueva v. Franklin Cty. Sheriff's Office*, 849 F. Supp. 2d 186, 191 (D. Mass. 2012).

In short, Beitman's claim is that Dr. Gruenberg failed to properly treat his injuries or send him to the hospital. Taking consideration of all the facts, a reasonable jury could find that Dr. Gruenberg exhibited deliberate indifference by failing to treat Beitman's possible fractures, pain, and ongoing complications. *See Jett*, 439 F.3d at 1096. If evidence presented at trial establishes a serious medical need, a jury could find that Dr. Gruenberg knew of and disregarded or failed to respond to that serious medical need. *See Farmer*, 511 U.S. at 837 (stating an official is liable for an Eighth Amendment violation if the "official knows of and disregards an excessive risk to inmate health"); *McGuckin*, 974 F.3d at 1060 (holding that deliberate indifference established where a defendant "purposefully ignore[s] or fail[s] to respond to a prisoner's pain or possible medical need"); *see also Jett*, 439 F.3d at 1096 (reversing summary judgment ruling for

defendants after concluding that the plaintiff presented sufficient evidence to establish defendants were deliberately indifferent to his need to have his fractured thumb set and cast).

### 3.    Harm Caused by the Indifference

The final question in the Eighth Amendment analysis is whether Beitman suffered harm as a result of Dr. Gruenberg's deliberate indifference. *See Jett*, 439 F.3d at 1096; *Hunt*, 865 F.2d at 200. Defendants do not address this element except to assert that the x-rays showed no fractures. (*See* Doc. 103 at 4–5.) However, as discussed, there is a material dispute of fact as to whether Beitman suffered fractures. If the jury finds that Beitman had fractures, there could be a finding of harm from Dr. Gruenberg's failure to treat them. *See Jett*, 439 F.3d at 1098.

However, even if Beitman cannot show fractures, Beitman could still have been harmed. Beitman avers that during the five weeks he remained in detention, he continued to suffer pain and to bleed from his sinuses, and, eventually, his cheekbone stopped moving but remained pushed inward and that he now has facial disfigurement. (Doc. 129 ¶ 41; Doc. 7 at 4.) Beitman also asserts that since the 2015 assault, he has suffered pain, constant pressure headaches, exophthalmos, and incomplete eye closure. (Doc. 129 ¶ 44.) *See S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (noting a declarant has personal knowledge of his or her own symptoms). Beitman's injuries and pain could be found to constitute harm sufficient to support an Eighth Amendment claim. *See Estelle*, 429 U.S. at 103 (holding that the Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"); *Jett*, 439 F.3d at 1098 (stating deformity caused by delay in treating injury was harmful to inmate); *McGuckin*, 974 F.2d at 1060 (concluding that pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action).

### 4.    Conclusion

Accordingly, summary judgment will be denied as to Dr. Gruenberg. There are material questions of fact as to each element of Beitman's Eighth Amendment claim against Dr. Gruenberg. Therefore, Dr. Gruenberg has not shown entitlement to summary judgment.

## V.    CCS

### A.    Legal Standard

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that a policy, decision, or custom promulgated or endorsed by the private entity violated the prisoner's constitutional rights. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law). Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom "was the moving force behind the constitutional injury." *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001) (internal quotation marks and citation omitted).

### B.    Discussion

#### 1.    Constitutional Injury

As set forth above, to support an Eighth Amendment violation, a prisoner must demonstrate a serious medical need and deliberate indifference to that need. *Jett*, 439 F.3d at 1096.

Beitman claims that CCS failed to provide proper specialist treatment for his alleged fractures following the February 3, 2015 assault and that, through the actions and inactions of its staff, CCS engaged in a pattern and practice of denying proper diagnosis and treatment for the purpose of limiting or avoiding costs of such treatment, which

caused Beitman to suffer unnecessary pain and disfigurement. (Doc. 7 at 4; Doc. 129 ¶ 41.) Beitman asserts that CCS medical staff were aware of Beitman's initial injuries following the February 3, 2015 assault; the treating provider failed to treat possible fractures; Beitman filed multiple HNRs seeking medical treatment for continued pain, bleeding from his sinuses, and a fragile and moving cheekbone; medical staff ignored Beitman's HNRs for five weeks; and, after the purported negative x-ray results, CCS provided no further treatment—beyond giving him pain relief medication—in response to Beitman's requests for care. (Doc. 7-1 at 4 ¶ 21; Doc. 129 ¶¶ 41–42; Doc. 130 at 2.) A reasonable jury could find that the CCS medical staff's failure to respond to Beitman's HNRs and failure to provide any treatment for five weeks despite his reported symptoms and pain constituted a failure to respond to Beitman's pain or possible medical need and amounted to deliberate indifference. *Jett*, 439 F.3d at 1096.

## 2.    Remaining *Monell* Elements

In their Motion, Defendants fail to address whether CCS can be subjected to liability under *Monell* based on a policy or custom that caused Beitman's alleged injuries. (*See* Doc. 103.) Instead, Defendants' argument for summary judgment as to CCS is that there is no evidence that Beitman suffered any fractures or that CCS was deliberately indifferent to Beitman's medical needs. (*Id.*) Whether Beitman suffered fractures is a disputed question of fact.

Because Defendants present no argument for summary judgment on the *Monell* claim against CCS, they fail to meet their initial burden to establish an absence of evidence as to the existence of a policy or practice that was the moving force behind the alleged constitutional violation here. (Doc. 103); *see* Fed. R. Civ. P. 56(c)(1); *Nissan*, 210 F.3d at 1102 (noting that summary judgment movant must "either produce evidence negating an essential element of" the claim at issue or show that the plaintiff does "not have enough evidence of an essential element to carry [his] ultimate burden of persuasion at trial"). Beitman was not obligated to respond to arguments not raised in Defendants' Motion. *See Nissan*, 210 F.3d at 1102–03; *Greene v. Solano Cty. Jail*, 513 F.3d 982, 990

(9th Cir. 2008) (stating a pro se plaintiff cannot be expected to anticipate and prospectively oppose arguments that a defendant does not make). Consequently, there is a question of fact as to whether CCS is liable for deliberate indifference based on a policy or practice of denying proper diagnosis and treatment, and thus, summary judgment as to CCS will be denied.

## VI.    RYAN AND CORIZON

As noted, Ryan and Corizon joined the summary judgment motion filed by Dr. Gruenberg and CCS. (Docs. 131; 140.) Because the summary judgment motion for Dr. Gruenberg and CCS was limited to asserting that Beitman had no serious medical need, or, in the alternative, that Dr. Gruenberg's response was adequate, the Court's summary judgment ruling applies to both Ryan and Corizon based on the same reasoning that the Court already articulated. In other words, the Motion for Summary Judgment filed by Defendants Dr. Gruenberg and CCS (Doc. 103) did not show that Ryan and Corizon are entitled to to summary judgment. Summary judgment as to Ryan and Corizon will be denied.

## VII.    SUBSTITUTION IN OFFICIAL CAPACITY CLAIM AGAINST RYAN

Beitman has sued Ryan in his official capacity. *Supra* p. 2 note 4; (Doc. 7 at 6–7 ("Plaintiff further seeks . . . medical treatment to re-fracture and repair the damage to Plaintiff's face caused by Defendants' actions and inactions.").) An official-capacity suit is "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Monell*, 436 U.S. at 690, n.55. Ryan was director of the ADC at the time Beitman filed suit against Defendants. Therefore, the suit against Ryan in his official capacity is a suit against the ADC.

Ryan is no longer the ADC Director. Under Federal Rule of Civil Procedure 25(d), when an officer sued in his or her official capacity dies, resigns, or otherwise ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). David Shinn is the current ADC Director, and he is the proper official to respond to injunctive relief. *See* Ariz. Rev. Stat. § 31-

201.01(D). Accordingly, David Shinn will be substituted as the defendant for Beitman's official capacity claim for injunctive relief.[12] However, Beitman's claim against Ryan in his personal capacity will go forward.

**VIII. CONCLUSION**

**IT IS ORDERED:**

(1) The Clerk of Court shall correct the caption on the docket from "Correct Clear Solutions" to "Correct *Care* Solutions, et al."[13]

(2) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 103.)

(3) Defendants' Motion for Summary Judgment (Doc. 103) is **denied** as to all defendants.[14]

(4) David Shinn is substituted as defendant for Plaintiff's official capacity claim for injunctive relief.

(5) This action is referred to Magistrate Judge Eileen S. Willett to conduct a settlement conference.

(6) Defense counsel must arrange for the relevant parties to jointly call Magistrate Judge Willett's chambers at (602) 322-7620 within 14 days to schedule a date for the settlement conference.

Dated this 17th day of March, 2020.

James A. Teilborg
Senior United States District Judge

---

[12] Ryan remains a defendant as to the individual capacity claim against him for damages.

[13] The Complaint wrongly asserted a claim against "Correct Care Solutions" rather than "Correct *Clear* Solutions." (Doc. 1.)

[14] Beitman raised other objections in his various filings relating to the Motion for Summary Judgment (Doc. 103). The issues Beitman raised in these objections did not affect the Court's analysis. Thus, the objections are overruled as moot without prejudice to Beitman raising them again at trial, if appropriate.